Jeffrey J. Hunt (5855) (jhunt@parrbrown.com)
David C. Reymann (8495) (dreymann@parrbrown.com)
Cheylynn Hayman (9793) (chayman@parrbrown.com)
Megan Houdeshel (12419) (mhoudeshel@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah  84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

Attorneys for Defendants Bold Films LP, Bold
Films Productions, LLC, Open Road Films, LLC,
and NBCUniversal Media, LLC

---

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, NORTHERN DIVISION

---

| | |
|---|---|
| RICHARD DUTCHER, <br><br> Plaintiff, <br><br> v. <br><br> BOLD FILMS LP, BOLD FILM PRODUCTIONS, LLC, OPEN ROAD FILMS, LLC, and NBCUNIVERSAL MEDIA, LLC, <br><br> Defendants. | **DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** <br><br> **(Oral Argument Requested)** <br><br> Case No. 2:15-cv-00110-DB <br><br> Judge Dee Benson |

# TABLE OF CONTENTS

PRECISE RELIEF SOUGHT AND GROUNDS FOR MOTION ................................................. iii

INTRODUCTION ........................................................................................................ iv

FACTUAL BACKGROUND ........................................................................................... vi

ARGUMENT ................................................................................................................ 1

   I.   PLEADING REQUIREMENTS AND STANDARD OF REVIEW .................................. 1

  II.   LAW GOVERNING COPYRIGHT INFRINGEMENT CLAIMS .................................. 1

 III.   DUTCHER HAS FAILED TO ALLEGE FACTS SHOWING EITHER ACTUAL OR INFERRED ACCESS TO *FALLING* ................................................................ 4

      A.   Dutcher Has Not Sufficiently Alleged Mr. Gilroy Had Access to *Falling* ............... 4

      B.   Dutcher Cannot Satisfy His Heightened Burden of Establishing that *Falling* and *Nightcrawler* Are Strikingly Similar .......................................................... 7

 IV.  *NIGHTCRAWLER* AND *FALLING* ARE NOT SUBSTANTIALLY SIMILAR AS A MATTER OF LAW ....................................................................................... 10

      A.   Characters ....................................................................................... 14

      B.   Plot ................................................................................................ 16

      C.   Dialogue .......................................................................................... 21

      D.   Pace ................................................................................................ 23

      E.   Setting ............................................................................................. 23

      F.   Mood ............................................................................................... 25

      G.   Cinematography ................................................................................ 25

      H.   Sequence of Events ........................................................................... 26

      I.   Religion ........................................................................................... 29

  V.   THIS CASE MERITS AN AWARD OF ATTORNEYS' FEES AND COSTS TO DEFENDANTS ................................................................................................ 31

CONCLUSION ........................................................................................................... 32

## <u>PRECISE RELIEF SOUGHT AND GROUNDS FOR MOTION</u>

Pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure*, Defendants Bold Films LP, Bold Films Productions, LLC (collectively, "Bold Films"), Open Road Films, LLC, and NBCUniversal Media, LLC (collectively, "Defendants") respectfully move to dismiss with prejudice Plaintiff Richard Dutcher's ("Dutcher") claim against Defendants for copyright infringement on the ground that Dutcher has failed to state a claim on which relief may be granted.

The basis for this Motion is that Dutcher cannot satisfy either requirement for the "copying" element of a copyright infringement claim.  This is because (1) Dutcher has failed to adequately allege that Defendants and/or Dan Gilroy, the writer of *Nightcrawler*, had access to the allegedly infringed work, and the works are not so strikingly similar that access can be legally inferred; and (2) even if Dutcher had properly pled access, the works at issue are not substantially similar.

Pursuant to DUCivR 7-1(f), Defendants respectfully request oral argument on this Motion.

# INTRODUCTION

Dan Gilroy, the writer of the Oscar-nominated screenplay for *Nightcrawler*, is an accomplished screenwriter and director.  For over two decades, Mr. Gilroy has authored and co-authored numerous successful screenplays, including *The Bourne Legacy*, *Freejack*, *Chasers*, and *Two for the Money*.  Plaintiff Dutcher, by contrast, is a niche filmmaker relatively unknown in the film industry.  He is known primarily among local Utah residents as a screenwriter and director of LDS-themed films.

In 2007, Dutcher briefly screened a movie called *Falling* that he wrote and directed, and in which he cast himself in the leading role.  The movie was screened on an extremely limited basis in Salt Lake City and Los Angeles.  *Falling* was not successful, was never shown in theaters again, and was never released on DVD or to home audiences.  Seven years passed.  In October 2014, Mr. Gilroy, Bold Films and Open Road released *Nightcrawler*, a film that Mr. Gilroy conceived and had been working on since the late 1980s.  The film met with great success and was nominated for multiple awards, including for Best Writing, Original Screenplay at the 2015 Academy Awards.

Seizing on the mere fact that characters in both films happen to work as freelance crime scene photographers, also known as "stringers" or "nightcrawlers," and no doubt hoping to use the controversy to generate interest in his earlier unsuccessful film, Dutcher filed this lawsuit in February 2015.  Dutcher argues that Mr. Gilroy somehow saw Dutcher's never-publicly-released film from years earlier and copied it when he wrote *Nightcrawler*.  Dutcher's lawsuit lacks merit and should be dismissed.

"Nightcrawlers" are not a new concept.  They have been around for decades, dating back to the early 1930s and the godfather of freelance crime scene photographers, Arthur "Weegee" Fellig, who listened to early police-band radios so he could go to fresh crime scenes and obtain gruesome photographs to sell to newspapers for publication.  Over the years, there have been numerous films about similar freelance photographers and videographers, including *Ace in the Hole* (1951) and *The Public Eye* (1992).  Most recently, there was a television reality series about nightcrawlers called *Stringers: LA*, which aired from 2007-2009.

Dutcher claims that *Falling* and *Nightcrawler* are so similar that the latter is a virtual copy of his work.  That claim is belied by even the most cursory review of the two films, which are, quite literally, night and day different.  Except for unprotected stock elements and generic *scenes a faire* that one would commonly expect to see in a movie featuring freelance crime scene videographers—for example, characters driving around listening to police radios, ducking under crime scene tape, obtaining gruesome footage, catching a crime in the act, etc.—the two films are nothing alike.  Dutcher's attempts to manufacture a copyright claim by piecing together random, out-of-context similarities will be instantly apparent to the Court when it reviews the two films in their entirety and compares the two works as a whole, as the law requires.

To state a claim for copyright infringement, a plaintiff must allege facts showing "copying," which consists of two elements: (1) that the defendant had access to the copyrighted work; and (2) that the two works are substantially similar.  Failure to satisfy either element is grounds for dismissal of the claim.  Here, Dutcher fails on both counts.  He has alleged no facts that Mr. Gilroy ever saw Dutcher's never-publicly-released movie, nor are the films so strikingly similar that access can be legally inferred.  And even if Dutcher could allege access by Mr.

Gilroy, the two films are not even close to substantially similar.  On either ground, Dutcher has

failed to state a plausible claim for copyright infringement.

## FACTUAL BACKGROUND

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), this

Court must accept as true "all well-pleaded factual allegations in the complaint and view them in

the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys. Inc.*, 706 F.3d

1231, 1235 (10th Cir. 2013).  In addition to considering facts "asserted within the four corners of

the complaint," *Wager v. Littell*, No. 12-CV-1292, 2013 WL 1234951, at *2 (S.D.N.Y. March

26, 2013), this Court also may refer to the original work and allegedly copyrighted work referred

to in the complaint.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

Indeed, for purposes of a Rule 12(b)(6) motion, "the legal effect of [such] works are determined

by the works themselves rather than by allegations in the complaint." *Jacobsen*, 287 F.3d at

941-42.  Accordingly, "[i]n determining copyright infringement, the works themselves supersede

and control contrary allegations and conclusions, or descriptions of the works as contained in the

pleadings." *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985).

As such, the Court's determination of this Motion will be based on its own independent

review of *Falling* and *Nightcrawler* as a whole—not the piecemeal, out-of-context clips provided

by Dutcher.  To facilitate the Court's review, Defendants are concurrently submitting a copy of

*Nightcrawler* with this Motion.  Dutcher has represented he will be separately filing a copy of

*Falling* under seal with the Court.

To provide context to the arguments on substantial similarity below, following are very brief descriptions of *Falling* and *Nightcrawler*.  For the Court's convenience, a more thorough, scene-by-scene summary of the two films is attached hereto as Exhibit A.

**A.**      <u>***Falling***</u>.

*Falling* is a religiously-themed morality tale about two essentially good people who, through a series of bad choices, spiritually "fall" and are killed as a result of their poor moral decisions.

The film centers on the relationship between two main characters: Eric Boyle and his wife, Davey.  Eric is an aspiring screenwriter and Davey is an aspiring actress.  Both are former members of the LDS Church who moved to Los Angeles twelve years earlier to pursue their Hollywood dreams.  Neither has succeeded and their religious faith has lapsed.  Davey continues to audition for small films, while Eric tries to sell screenplays, earning money in the meantime as a daytime freelance photographer and videographer taking pictures and videos at crime and accident scenes.  Eric's time spent on this job is not a major part of *Falling*.  The film dedicates less than five minutes of total screen time to Eric visiting crime and accident scenes.

Both Eric and Davey emotionally struggle with the moral compromises their work requires—Eric taking violent footage or writing violent screenplays and Davey having an affair with a casting director in an attempt to get a movie part—and the effects those compromises have on their marriage.  A lengthy scene shows Eric trying to sell a screenplay to a Hollywood producer; another shows Davey struggling to prove herself during acting class.  Their stories parallel each other in the compromises they make as their relationship degrades, and as Eric laments the loss of his LDS faith.  At one point, while on a payphone with Davey, Eric randomly

witnesses (rather than seeking out) a gang stabbing and murder, which Eric films rather than

helping the victim and then sells the footage.  (This, by the way, less than halfway through the

movie, is the last scene involving Eric videoing a crime scene.)  In her parallel storyline, Davey

is then shown taking her clothes off at an audition—one of the longest scenes in the film—and

later kissing the casting director with whom she is having an affair.

These moral failings inevitably lead to the destruction of Davey's and Eric's marriage, as

well as each other.  Davey reveals to Eric that she has had an abortion and is not sure the baby

was his.  Eric responds by almost choking Davey to death.  Eric then discovers that his boss,

Hector, has been murdered by the gang members in the footage Eric shot and that the gang

members have Eric's address.  Eric returns home to find Davey hanging from the ceiling,

apparently staged by the same gang members.  (Why gang members who have already

committed two murders and are on the run from police would try to stage Davey's murder as a

suicide is not apparent.)  Eric then confronts the gang members and kills them in gratuitously

brutal fashion while being fatally stabbed himself.  As Eric hallucinates and approaches death, a

sequence filled with religious imagery depicts Eric kneeling before a Christus statue at the LDS

Temple and begging God for help while stigmata-like cuts drip from his palms.  Then he dies.

That is the end of the movie.

### B.     *Nightcrawler*.

*Nightcrawler* is a dark film about a sociopath named Louis "Lou" Bloom who, devoid of

any moral compass, views the world in purely transactional terms and is unrestrained by

empathy, guilt, or regret.  Lou's ultimate triumph in the film is a direct result of his lack of moral

values and his elevation of business success over all else.  *Nightcrawler* has nothing to do with

religion, aspiring actresses, or lost faith.  It is a critique of capitalism designed to illustrate how an amoral system unduly rewards amoral actors like Lou at the expense of those with consciences.

Lou begins the film as a petty thief looking for a job.  He comes across a nighttime accident scene by happenstance and observes a nightcrawler named Joe recording gruesome footage to sell to the local news.[1]  After Joe declines to give Lou a job, Lou decides to become a nightcrawler on his own, stealing a bicycle to pawn for a police scanner and crude camcorder.

From that point on, *Nightcrawler* is occupied almost exclusively by Lou's nightcrawling activities and his interaction with the news station to whom he sells his footage.  Lou hires an "intern" named Rick to drive him around at night and help decode the police scanner while Lou obtains sensationalist footage.  Over the course of several weeks, Lou becomes increasingly successful in selling his footage and upgrades his car, scanning equipment, and camera.  He also becomes increasingly valuable to Nina, the news director of the local station who craves ratings and has only slightly more of a moral compass than Lou.  Lou uses this leverage over Nina to force her to go on a date with him, and then to sleep with him, under threat that Lou will begin selling his footage to another station.

Lou's most lucrative footage to date comes when he gets to a home invasion scene before the police and records two murderers leaving the premises, as well as graphic footage of the dead

---

[1] *Nightcrawler* occurs almost exclusively at night because that is when freelance videographers work.  During the day, local news outfits have their own cameramen to capture footage. Nightcrawlers fill the void from 10:00 p.m. to 6:00 a.m., when union pay goes to double or triple time and stations are unwilling to have their own employees on the streets.  The fact that Dutcher portrayed Eric in *Falling* as a daytime freelance videographer demonstrates a lack of knowledge about the nightcrawling culture and underscores how ancillary Eric's job is in *Falling*.

bodies inside.  This footage is used by the news station to produce several stories designed to stoke fear of poor people invading rich neighborhoods—something Nina says rates far higher than stories of crime in poor neighborhoods.[2]  Before selling the footage, however, Lou alters it to keep the identities of the murderers to himself, information he later uses to track them down and stage an elaborate police shootout that he also records on video.  In the course of this shootout, several people are killed, including Rick, whom Lou intentionally lures into harm's way and then callously records as Rick dies.

Following these events, Lou is interrogated by the police, to whom he successfully lies and escapes without consequence.  The film ends with Lou at a new pinnacle of success, with two new vans and several new "interns" driving off into the Los Angeles night.

---

[2] This theme is part of *Nightcrawler*'s critique of capitalism—the idea that footage of crimes against poor people in poor neighborhoods does not sell because poor lives matter less.  In that way, this scene could not be any more different than the murder scene in *Falling*, which is in a poor part of town involving an apparently poor victim.

## ARGUMENT

### I.   PLEADING REQUIREMENTS AND STANDARD OF REVIEW.

Although a plaintiff need only provide "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), the allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The United States Supreme Court has made clear that satisfying this burden "requires more than labels and conclusions, and a formulaic recitation of the elements." *Id.*  To survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true." *Id.* at 555-56.

As noted above, when analyzing the sufficiency of a copyright infringement claim, the Court must review the actual works referenced in the complaint, rather than relying on any characterizations in the pleadings of such works.  *See Jacobsen*, 287 F.3d at 941.  Thus, consideration of both *Falling* and *Nightcrawler* as a whole is appropriate in the context of a motion to dismiss.  *See also Lyles v. Capital-EMI Music Inc.*, No. 2:12-CV-00751, 2013 WL 6000991, at *4 (S.D. Ohio Nov. 12, 2013) ("Where, as here, the works in question are made part of the pleadings in the case, it is entirely appropriate for the district court to address the issue of substantial similarity in connection with a motion to dismiss."); *Harris v. Mattel Inc.*, No. 12-CV-0404, 2013 WL 3154124, at *3 (E.D. Okla. June 21, 2013) (same).

### II.   LAW GOVERNING COPYRIGHT INFRINGEMENT CLAIMS.

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  However, "[o]riginality does not signify novelty." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 345 (1991).  Even if a work "closely

resembles other works," the subsequent work is still original and does not infringe on the original work "so long as the similarity is fortuitous [and] not the result of copying." *Id.*

The reason for this balance is that copyright law recognizes "society's competing interests in the free flow of ideas [and] information." *Sony Corp. of Am. v. Universal Studios, Inc.*, 464 U.S. 417, 429 (1984). To fairly weigh the interests of authors and the public, copyright protection extends only to "the components of a work that are original to the author and possess at least some minimal degree of creativity," *Feist*, 499 U.S. at 345, 348, not the ideas underlying the original expression. *See Blehm v. Jacobs*, 702 F.3d 1193, 1200 (10th Cir. 2012). Said another way, "copyright laws do not protect ideas, but only particular expressions of ideas," *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1249 (S.D.N.Y. 1995) (emphasis added), and "the original or unique way that an author expresses those ideas." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986) (emphasis added). To hold otherwise and prohibit the use of ideas would stifle creativity and disrupt the public interest balance. *See Blehm*, 702 F.3d at 1201 ("copyright law seeks to achieve a proper balance between competition based on public ideas and incentive to produce original work") (quoting *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1285 (10th Cir. 1996)).

Mindful of this public interest balance, infringement may be established only where a valid copyright exists <u>and</u> the second work actually *copied* protectable elements of the original protected work. *See La Resolana Architects v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009). For purposes of this Motion, Defendants do not dispute that Dutcher has a valid copyright in *Falling*. Therefore, the only question is whether copying has occurred.

The "copying element of an infringement claim has two components."  _Blehm_, 702 F.3d at 1199.  "First, a plaintiff must demonstrate that the defendant copied the plaintiff's work 'as a factual matter,'" often referred to as the "access" element.  _Id_. (citation omitted).  Second, even if access is adequately shown, "the plaintiff must establish 'substantial similarity' between the allegedly infringing work and the elements of the copyrighted work that are legally protected."  _Id_. (citation omitted).

Both of these inquiries—access and substantial similarity—can be decided by this Court as a matter of law.  _See, e.g., Madrid v. Chronicle Books_, 209 F. Supp. 2d 1227, 1240 (D. Wyo. 2002) (holding that "[a] court may find non-infringement as a matter of law where the similarity between the works concerns only non-copyrightable elements of the plaintiff's work, or no reasonable jury could find the two works to be substantially similar"); _Fisher v. United Feature Syndicate, Inc._, 203 F.3d 834 (10th Cir. 2001) (unpublished) (upholding grant of Rule 12(b)(6) motion to dismiss where plaintiff failed to adequately plead access and substantial similarity); _Lyles_, 2013 WL 6000991, at *3 (holding that "[a]bsent some nonspeculative basis from which to conclude that Plaintiff's songs got into the hands of Defendants…Plaintiff has failed to plead access in manner that would allow his copyright infringement claims to survive" a motion to dismiss"); _Wager_, 2013 WL 1234951, at *4 ("[P]laintiff has failed to adequately plead facts supporting unauthorized copying and thus has not plead a prima facie copyright infringement claim [and] Defendants' motion to dismiss is therefore granted.").

Here, Dutcher's copyright infringement claim fails both components of the copying element.  First, Dutcher has not alleged facts that could show actual or inferred access to

*Falling*.  Second, even if access had been properly alleged, *Falling* and *Nightcrawler* are not

substantially similar as a matter of law.  These two points are discussed below.[3]

## III.   DUTCHER HAS FAILED TO ALLEGE FACTS SHOWING EITHER ACTUAL OR INFERRED ACCESS TO *FALLING*.

"Direct proof of copying is rare," *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d

823, 833 (10th Cir. 1993), and Dutcher has not even attempted to allege it here.  Instead, he

relies on indirect allegations of copying.  A plaintiff can allege indirect copying in one of two

ways: (1) by alleging sufficiently specific facts that the defendant "had access to the

copyrighted work," *Country Kids*, 77 F.3d at 1284; or (2) by presenting two works that are so

"strikingly similar"—a standard higher than "substantial" similarity—that access is legally

inferred.  *La Resolana*, 555 F.3d at 1179.  Dutcher's claim fails on both counts.

### A.   Dutcher Has Not Sufficiently Alleged Mr. Gilroy Had Access to *Falling*.

To properly allege access, Dutcher must allege *facts* "showing that the defendant had a

reasonable opportunity to view or [an] opportunity to copy the allegedly infringed work."  *La*

---

[3] At times, Dutcher appears to argue that *Nightcrawler* is a derivative work based on *Falling*, and implies that this claim is somehow independent of his claim of substantial similarity.  That argument is incorrect.  To be derivative, a work must also satisfy the substantial similarity requirement.  *See Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) ("a work will be considered a derivative work *only if it would be considered an infringing work* if the material which it has derived from a prior work had been taken without the consent of a copyright proprietor of such a prior work…to prove infringement, one must show substantial similarity") (emphasis added)); *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2nd Cir. 1976) ("[A] work is not derivative unless it has substantially copied from a prior work."); *Madrid*, 209 F. Supp. 2d at 1235 ("The court rejects Plaintiff's attempt to sidestep the requirement in copyright infringement law of substantial similarity by reliance on the concepts of intermediate copying and derivative works, when actually these concepts still maintain the substantial similarity concepts.").  Thus, Dutcher cannot salvage his copyright claim by characterizing *Nightcrawler* as "derivative" of *Falling* when the two films are not strikingly or substantially similar as a matter of law.

*Resolana*, 555 F.3d at 1178 (quotations and citations omitted).  "[E]vidence that only creates a bare possibility that the defendant had access is not sufficient."  *Id.* (quotations and citations omitted).  A plaintiff must allege sufficient facts "to raise a right to relief above a speculative level."  *Twombly*, 550 U.S. at 555-56.

Here, the sum total of Dutcher's allegations that Mr. Gilroy had access to *Falling*—a film that was never commercially released and which Dutcher has apparently kept mothballed for nearly a decade—is the following singular, conclusory assertion:

> Upon information and belief, the actual writer of the *Nightcrawler* screenplay (whether it is Dan Gilroy or a ghostwriter) had access to the *Falling* motion picture.

[Dkt. No. 2 ¶ 15.]

The only conceivable basis for this speculative assertion is a passing reference in the Complaint's introduction that "Mr. Dutcher screened the movie in Los Angeles and Salt Lake City, and distributed a small number of DVDs."  [Dkt. No. 2 ¶ 1.]  Nowhere does Dutcher allege that Mr. Gilroy (or any of the Defendants) attended a screening of *Falling* or received one of the "small number" of DVDs that Dutcher distributed, nor could he do so consistent with Rule 11.  Dutcher does not allege even the *possibility* of such occurrences.[4]

These speculative allegations are woefully inadequate to survive a motion to dismiss. Courts have routinely rejected factual allegations of access far more robust than Dutcher alleges here.  In *Kenney v. Warner Brothers Entertainment, Inc.*, 984 F. Supp. 2d 9 (D. Mass. 2013), for example, the plaintiff had registered his allegedly infringed screenplay with the Writer's Guild

---

[4] Indeed, it is now clear that Dutcher **has no evidence** of access, because he has included none in his Motion for Preliminary Injunction.  The basis for Dutcher's allegation of access on "information and belief" in the Complaint is, therefore, a mystery.

of America, promoted the film through interviews and media outlets, and even had a website advertising his movie. *Id.* at 12-13. Notwithstanding these multiple avenues of potential access, the court reasoned the plaintiff had failed to "plausibly allege that Warner Brothers had a reasonable opportunity to access his work." *Id.* at 14. That failure was fatal to his copyright claim. *Id.* at 14 (granting motion to dismiss amended complaint).

Similarly, in *Webb v. Stallone*, 910 F. Supp. 2d 681, 687 (S.D.N.Y. 2012), *aff'd* 555 Fed. Appx. 34, 33 (2d Cir. 2014), the court rejected the contention that a plaintiff's screenplay for a movie called *Cordoba* was given to an agent who, in turn, must have given the screenplay to Sylvester Stallone. *Id.* at 687. "In the absence of … evidence presenting a reasonable possibility that Stallone viewed *Cordoba*, as opposed to mere speculation and conjecture, plaintiff … failed to raise a genuine issue of material fact on access." *Id*.

Numerous other courts have concluded likewise when confronted with similarly unsubstantiated allegations of access, granting motions to dismiss such claims. *See e.g., Wager*, 2013 WL 1234951, at *3 (allegation that plaintiff's work was exposed to third parties with no connection to the defendants warranted dismissal for failure to adequately plead access); *Martinez v. McGraw*, No. 3:08-0738, 2009 WL 2447611, at *5 (M.D. Tenn. 2009) (granting motion to dismiss where the plaintiff failed to assert "factual allegations that raise a right to relief above the speculative level"); *Lyles*, 2013 WL 6000991, at *3 (granting motion to dismiss because "absent taking a speculative leap…[plaintiff's] allegations do not provide a valid basis [to] infer that any of the radio stations or record companies were connected with defendants in such a manner that would have provided Defendants with an opportunity to copy Plaintiff's work").

Dutcher's singular, conclusory assertion that Mr. Gilroy had access to *Falling* does not allege facts that rise "above a speculative level." *Twombly*, 550 U.S. at 555-56. For that reason, Dutcher's claim depends entirely on establishing a legal inference of access based on striking similarity, which, for the reasons set forth below, is a burden he cannot meet.

**B.     Dutcher Cannot Satisfy His Heightened Burden of Establishing that *Falling* and *Nightcrawler* Are Strikingly Similar.**

Because he has failed to adequately plead access, the only way Dutcher can avoid dismissal of his copyright claim is to establish that *Falling* and *Nightcrawler* are so remarkably similar that they satisfy the heightened "striking similarity" test, such that access may be legally inferred. The two films do not come anywhere close to satisfying that standard.

"If a plaintiff is unable to demonstrate access, he may establish (factual) copying by establishing that the copyrighted work and the alleged infringing work are strikingly similar." *La Resolana*, 555 F.3d at 1179. Striking similarity exists only when the similarity between the two works is "so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Id.* (quotations and citations omitted). This striking similarity test is "stringent" and imposes "a much higher standard than for substantial similarity." *Vallery v. Am. Girl Dolls*, No. 13-5066, 2015 WL 1539253, at *3 (E.D. La. April 6, 2015) (finding that "the mere existence of multiple similar characteristics is not enough"); *see also McRae v. Smith*, 968 F. Supp. 559, 565-66 (D. Colo. 1997) (striking similarity "suggests such a close degree of similarity that independent creation could not have been possible" (citation omitted)); *Hofmann v. Pressman Toy Corp.*, 790 F. Supp. 498, 509 (D.N.J. 1990) ("In those few instances where courts have found striking similarity sufficient to prove access, the facts have shown that 'in virtually every detail, the [two works] are

identical[.]'" (citation omitted)).  Importantly, when determining whether striking similarity exists, courts must **compare the works as a whole**, not in discrete or disjointed parts.  *See Gates Rubber, 9 F.3d at 833 n.7.*

In *La Resolana*, the court held that the plaintiff could not establish a striking similarity between architectural plans where there were "major differences in the kitchen area, living area, master bath and roof slope, placement of doors, placement of plumbing, and placement of door openings, all of which affect traffic-flow and articulation of space." 555 F.3d at 1179.  Agreeing with the district court that "[t]hese differences so outweigh[ed] any similarities that the similarities [were] inconsequential within the total context of the work," the Tenth Circuit concluded that the plans were not strikingly similar and access could not be inferred.  *Id.*

In *Webb*, the plaintiff similarly failed to establish a striking similarity between his screenplay and Sylvester Stallone's film *The Expendables*.  910 F. Supp. 2d at 687-89.  In both works, the plaintiff pointed out that the antagonists shared the identical name "General Garza," and argued the heroines were strikingly similar because they were both related to the antagonist, helped the heroes, and were tortured by the antagonist's minions.  *Id.*  The plaintiff also identified numerous action scenes which he contended were strikingly similar to his screenplay, including:

> use of the heroine as a human shield in the accomplice's escape; strategic planting of explosives by mercenaries in key strategic positions before the coup begins; an attempted ambush by regime forces against the mercenaries; a climactic gun battle with sequenced explosions including detonation of a fuel repository to create a "reverse ambush"; the attempted use, and destruction of, the accomplice's escape helicopter; and a one-on-one standoff where the hero kills the accomplice in a surprise shooting tactic after the accomplice puts a gun to the heroine's head.

*Id*.

Notwithstanding this litany of seeming similarities, the court found "none of them remotely striking or legally sufficient." *Id.* at 689.  In reaching this conclusion, the court explained "'[t]he fact that characters have identical names and have similar roles in two works does not necessitate a finding of *substantial* similarity,'" much less striking similarity.  *Id.* (citation omitted).  The court also reasoned that the similarities between the two heroines was "hardly new," and indeed echoed "the familiar story of Robin Hood and Maid Marian."  *Id.* With regard to the lengthy list of seemingly similar action scenes, the court concluded the action scenes were nothing more than unprotected "*scenes a faire* that flow naturally from the theme of the work rather than from the author's creativity."[5]  *Id.* at 689.  Accordingly, the court reasoned that the plaintiff failed to satisfy the heightened striking similarity threshold and his copyright claim was dismissed.  *Id.*[6]

Upon reviewing *Falling* and *Nightcrawler*, this Court will have little trouble concluding that the two films are not strikingly similar.  They are different in almost every way— characters, themes, pace, mood, plot, subplots, aesthetic, message, dialogue, setting, and feel.  Any superficial similarities of unprotected elements, such as the fact that Eric and Lou both work as freelance crime scene photographers, are simply overwhelmed by the numerous differences between the two films.  As explained in detail in Section IV below, *Falling* and

---

[5] The *scenes a faire* doctrine is discussed in more detail below.  *See* Section IV, *infra*.

[6] The court reached a similar conclusion in *Cox v. Abrams*, No. 93 CIV 6899, 1997 WL 251532, at *5 (S.D.N.Y. May 14, 1997) (comparing plaintiff's novel *Breaking the Tape* and the Harrison Ford film *Regarding Henry* and concluding that "[w]hile both works open with a tragic accident in which a lawyer suffers a head injury, the stories that unfold from each accident are completely different" and accordingly "the two works [] lack the necessary level of similarity to create an inference of copying").

*Nightcrawler* do not even satisfy the less onerous substantial similarity standard, much less bear similarities "so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *La Resolana*, 555 F.3d at 1179 (quotations and citations omitted).

As a result, Dutcher cannot satisfy the first requirement of the copying element of an infringement claim. He has alleged no actual facts showing that Mr. Gilroy had access to *Falling*, and the works are not so strikingly similar that access can be legally inferred. That is the end of the inquiry, because even if the works are substantially similar (and they are not), an infringement claim fails without a showing of access. On that basis alone, Defendants' Motion should be granted.

## IV.   *NIGHTCRAWLER* AND *FALLING* ARE NOT SUBSTANTIALLY SIMILAR AS A MATTER OF LAW.

Even if Dutcher could establish that Mr. Gilroy somehow had access to *Falling*, his copyright claim still fails as a matter of law because the two works are not substantially similar.

"The mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist*, 499 U.S. at 348. Even if copied verbatim, unprotected elements "cannot serve as the basis for ultimate liability for copyright infringement." *Gates Rubber*, 9 F.3d at 833. Rather, "liability for copyright infringement can only attach where *protected elements* of a copyrighted work are copied." *Madrid*, 209 F. Supp. 2d at 1237.

In determining whether protected elements are substantially similar, the Tenth Circuit applies an "abstraction-filtration-comparison" test. This requires the court to (1) separate the unprotected ideas and basic utilitarian functions from the particular expression of the work; (2) filter out the nonprotectable components of the original expression; and then (3) compare the

remaining protected elements to the alleged copied work to determine if the two works are substantially similar.  *Id.* at 1239 (citing *Gates Rubber Co.*, 9 F.3d at 842).

"The essence of this test is whether the 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (citation omitted).  A work is substantially similar only if it "is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Country Kids*, 77 F.3d at 1288.  A "compilation of random similarities scattered throughout the works" is not sufficient to satisfy the substantial similarity analysis.  *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994).

In comparing the two films at issue, it bears re-emphasizing that "copyright laws do not protect ideas, but only particular expressions of ideas," *Arden*, 908 F. Supp. at 1249—in other words, "the original or unique <u>way</u> that an author expresses those ideas," rather than the idea itself.  *Walker*, 784 F.2d at 48 (emphasis added).  This is because the essence of infringement lies not in taking a general theme but in "particular expression through similarities of treatment, details, scenes, event, and characterization."  *Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231, 239 (2d Cir. 1983).  This balances the tension between "assuring the author of an original work the exclusive benefits of whatever commercial success his or her work enjoys" and not deterring "the creation of new works if authors are fearful that their creations will too readily be found to be substantially similar to preexisting works."  *Arden*, 908 F. Supp. at 1259 (internal quotations omitted).

In order to stimulate the creation of new works, courts universally recognize a number of elements which are not protected.  For instance, copyright law does not prevent a subsequent user from copying facts or materials that are available in the public domain.  Madrid, 209 F. Supp. 2d at 1241 ("'It is axiomatic that material in the public domain is not protected by copyright.'" (citation omitted)).  Nor does copyright protect generalized themes and ideas, all of which continue to remain in the public domain.  Id.

Of particular significance here, also excluded from copyright protection are what are referred to as *scenes a faire*, defined as "incidents, characters, or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979 (2d Cir. 1980), cert. denied, 449 U.S. 841 (1980).  This doctrine excludes from copyright protection stock elements, such as the "familiar figure of the Irish cop" in police fiction, Walker, 784 F.2d at 50, and "thematic concepts or scenes which necessarily must follow from certain similar plot situations." Smith v. Weinstein, 578 F. Supp. 1297, 1302 (S.D.N.Y. 1984).  Where themes are "commonly linked to a particular genre," they are protected under copyright law only "to the extent they are given unique … expression in an original creation." Arden, 908 F. Supp. at 1259.

An illustrative example of the *scenes a faire* doctrine is *Walker*, in which the Second Circuit examined two works which "recount the experiences of [New York] policemen battling the hostile environment of the 41st Precinct." Id. at 1250.  Although both works "begin with the murder of a black and white policeman with a handgun at close range; both depict cockfights, drunks, stripped cars, prostitutes and rats; both feature as central characters third-or fourth-generation Irish policemen who live in Queens and frequently drink, [and] both show

disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals," the court held these similarities only related to uncopyrightable material. *Id.* In reaching this conclusion, the court explained that because "[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx," and "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," the elements on which the plaintiff attempted to base his claims were unprotected *scenes a faire*. *Id.*; *see also Madrid*, 209 F. Supp. 2d at 1230-31 (applying *scenes a faire* doctrine to reject copyright claim regarding common elements in children's stories).

When courts analyze creative works like *Falling* and *Nightcrawler*, they typically examine a number of different elements to determine whether the works are substantially similar, including characters, plot, dialogue, pace, setting, mood, cinematography, and sequence of events. *See, e.g., Arden*, 908 F. Supp. at 1260-1262; *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994); *Denker v. Uhry*, 820 F. Supp. 722, 730-36 (S.D.N.Y. 1992); *Robinson v. Viacom Intern., Inc.*, No. 93 Civ. 2539, 1995 WL 417076, at *8 (S.D.N.Y. July 13, 1995). In his Motion for Preliminary Injunction [Dkt. No. 23], Dutcher argues that *Nightcrawler* copies all of these protected elements.[7] None, however, is even remotely similar to *Falling* in any protected respect.

---

[7] Dutcher presumably sets forth his best argument for substantial similarity in his Motion for Preliminary Injunction, which includes argument from not only Dutcher but also his "film expert," Dr. Eric Samuelsen. Because Dr. Samuelsen's declaration consists almost entirely of characterization and argument, rather than comparison of protected elements in the films, and because the court's analysis is based on the observations of an ordinary observer, Dr. Samuelsen's arguments are not helpful to the legal analysis of substantial similarity.

A.      **Characters.**

Perhaps the most striking difference between *Falling* and *Nightcrawler*, a difference that animates the central meaning of each film, is the characters.

*Falling* is the story of an essentially good man whose dreams have gone unrealized, whose faith has been eroded, and who performs morally questionable work with remorse, longing to regain his religious devotion and improve his marriage.  *Falling* is filled with scenes, some exceedingly long, depicting both Eric and Davey regretting the consequences of their moral failings and wishing to do better.  Eric's ultimate descent into the violent events that end his and Davey's lives is random, unwanted, and a source of personal anguish.  Eric's final plea for help from God is a circularity event, signaling his return to the faith he held as a former missionary and illustrating the fundamental story arc of the film.

*Nightcrawler* is the story of a sociopath who has none of the moral trappings on which *Falling* is based.  Lou is not religious; he is not remorseful; and he openly courts and actively arranges the violent events that drive the film.  Not one scene in *Nightcrawler* is devoted to Lou regretting anything, something his character is written to seem incapable of.  He has no wife, no dreams of being a screenwriter, and no relationships to negotiate other than his purely transactional associations with Nina and Rick.  He is, in every sense, a soulless embodiment of amoral capitalism, incapable of empathy, and driven solely by a rapacious desire for success.

To state what should be obvious, a returned missionary hoping to regain his faith and a homicidal sociopath incapable of remorse are not substantially similar.  The mere fact that both characters work as freelance videographers is wholly insufficient to support substantial similarity.  *See, e.g., Arden*, 908 F. Supp. at 1259 (observing familiar figure of an Irish cop is a

stock theme of police fiction that is protected under copyright law only "to the extent they are given unique ... expression in an original creation" (citation omitted)).[8]

Dutcher attempts to avoid this contrast by arguing that although Lou and Eric are different, they are actually *so* different that Lou should be seen as the "mirror image" of Eric. [Dkt. No. 23 pp. 9-10.]  According to Dutcher, if a work is so entirely different from another, it can somehow become substantially the same.  This "mirror image" theory of copyright law is novel, to put it charitably, and Defendants are unaware of any court that has ever adopted it.  Copyright claims require "substantial similarity," and "extremely different" does not mean similar.  This Court should decline Dutcher's invitation to rewrite copyright law and instead take the argument for what it is—an admission that the two works are not substantially similar.

Dutcher's remaining arguments regarding the similarity of other characters in the films are equally unpersuasive and do not require lengthy discussion.  Eric's wife Davey in *Falling* is a major character in the film who struggles like Eric with her own moral failings.  She is nothing like Nina, a supporting character in *Nightcrawler* who shows little moral backbone and is driven largely by broadcast ratings.  Dutcher's assertion that these two characters are the same because both are put in sexually compromising positions is a statement true of a vast many Hollywood movies, and at best nothing more than unprotected *scenes a faire*.  *See, e.g.,* Zambito, 613 F. Supp. at 1112 (characters who were female and shared "the common

---

[8] *See also* Denker, 820 F. Supp. at 734 ("[t]he protection afforded characters depicted in creative works is limited," and denying protection for stock characters); *id.* at 735 (main characters in *One Fine Day* and *Driving Miss Daisy* not substantially similar); Zambito v. Paramount Pictures Corp., 613 F. Supp. 1107 (E.D.N.Y. 1985) (archaeologists in *Raiders of the Lost Ark* and *Black Rainbow* not substantially similar); Beal, 20 F.3d at 462 (protagonists in *Coming to America* and *The Arab Heart* not substantially similar).

experience of a sexual encounter with the respective protagonists" were not substantially similar).

Even less persuasive is Dutcher's assertion that Lou's intern Rick is substantially similar to Eric's dead co-worker Luis, a character **who does not even appear** in Falling because he is killed before the film begins. "'[T]he less developed the characters, the less they can be copyrighted.'" *Smith*, 578 F. Supp. at 1303 (citation omitted). Because Luis is a completely undefined character, he merits no copyright protection. *See Denker*, 820 F. Supp. at 735-36 (character who appears only briefly in *Horowitz and Mrs. Washington* the viewer learns nothing about other than that "he is concerned with his father's well-being" and "too occupied with his supremely successful law practice to spend time with his father" was "too ill-defined to merit copyright protection").

**B.**      **Plot.**

Like their central characters, *Falling* and *Nightcrawler* have completely different plots. *Falling* is a religiously-themed morality tale about the consequences of losing one's faith. *Nightcrawler* is the story of a sociopath who takes advantage of a ruthless capitalist system to achieve business success. Nothing about their plotlines is even remotely the same.

Dutcher attempts to argue that the plots of the films are similar because both main characters work as freelance crime scene videographers. That assertion is insufficient, as the mere idea of nightcrawling is neither novel nor protected. But it also glosses over a fundamental difference in the films, which is that *Falling* is not really about nightcrawling at all. It is primarily about the failing relationship between Eric and Davey and Eric's desire to regain his faith. The fact that Eric is a freelance stringer—operating, notably, during the day—

is almost an incidental afterthought.  Any job of questionable morality could have fulfilled that role.  Indeed, there are only four scenes in the entire movie, occupying less than *five minutes* of screen time, in which Eric photographs or videos crime and accident scenes, and one of those Eric stumbles on entirely by accident.  The rest of the treatment of Eric's career goals focuses on his failed desire to be a screenwriter.

In contrast, *Nightcrawler* is almost entirely about Lou's nightcrawling activities.  The film follows him as he transforms from a slick-talking petty thief into a fledgling amateur nightcrawler, then into professional nightcrawler willing to do whatever it takes to advance his business, and finally into a successful entrepreneur.  Very little of the film addresses anything else.  Lou does not stumble on his murder scenes by accident.  He openly seeks, and sometimes actively arranges, those events.  All of the subplots in the film, such as Lou's interaction with a competing nightcrawler and the police investigation into the home invasion murders, flow directly from the central plotline.  Unlike *Falling*, there is no secondary relationship-driven plot in *Nightcrawler* on which the moral failings of Lou's work are visited.  *See Beal*, 20 F.3d at 461 (existence of second plot in the original work was relevant and contributed to finding that the works differed enough to preclude a finding of substantial similarity).

At its core, Dutcher's plot argument is really just that both films involve crime scene stringers, and therefore share certain necessary similarities, such as characters driving the streets of Los Angeles, listening to police band radios, obtaining progressively more graphic footage, and eventually getting drawn into dangerous situations.  [Dkt. No. 23 pp. 2-5.]  Aside from the other stark plot differences between the two films, those superficial similarities are nothing more than unprotected *scenes a faire*.  If one were to write a story about a freelance stringer,

one would naturally expect the character to engage in such activities.  As documented by the reality television program *Stringers: LA*, which was aired years before *Nightcrawler's* release, real-life stringers routinely do all of these things.[9]  So have stringer characters in other films.[10]

Numerous courts have considered—and rejected—arguments very similar to the ones Dutcher advances here.  One example illustrates this point.  In *Arden*, the plaintiff claimed the film *Groundhog Day*, starring Bill Murray, infringed on his novel *One Fine Day*, which tells a similar "story of a man trapped in a repeating day, forced to live the same day over and over." 908 F. Supp. at 1249.  The court acknowledged that both works shared not only a common idea but common elements, such as waking each day to the same alarm clock; references to suicide; lead characters pursuing love interests; characters repeating "actions, conversations, and events," including seeking "medical and psychiatric assistance for [their] problem;" and "us[ing] knowledge gained in previous repetitions of the day to their advantage or to aid others." *Id.* at 1250, 1254, 1262-63.  Notwithstanding these similarities, the court found when it

---

[9] *See, e.g., Stringers: LA (Episode 1)*, available at https://www.youtube.com/watch?v=-pYDF8KwA2k (professional stringers drive the streets of Los Angeles recording footage of two car accidents, a crash caught on camera, police pursuit of the suspect, and the suspect taken into custody; while driving the streets of Los Angeles the stringers pass the Los Angeles LDS Temple at 21:22)); *Stringers: LA (Episode 3)*, available at https://www.youtube.com/watch?v=1C4CP5aqofY (two stringers drive the streets of Los Angeles and battle for the best footage of a high-speed car chase; the behind-the-scenes cameraman for the reality series continues to film a man trapped in a burning car without rendering assistance).

[10] *See, e.g., The Public Eye* (1992), in which the main character listens to police radio, drives the streets of 1940s New York and obtains graphic photos, including a murder victim lying in a pool of blood and a murder victim with a cleaver gruesomely embedded in his skull—for which the character is notably paid almost seven times what he receives for the first murder.  The character also obtains photos of a deadly massacre, about which he had advance notice and hid in a closet to obtain.  A copy of *The Public Eye* is submitted concurrently herewith.  *See also, e.g., Ace in the Hole* (1951) and *Picture Snatcher* (1933).

looked beyond the basic story of a man who experiences a repeating day, the "differences in the plot and structure far outweigh[ed] this general likeness." *Id.* at 1260. Observing that any similarities in the sequence of events were "incidental to the idea of a repeating day" but that the actual *ways* in which details and events were expressed were different, *id.* at 1261, the court reasoned that any similarities in the structure of the two works were either "insubstantial," *id.* at 1263, or "stem[med] directly from the idea of a repeating day." *Id.* at 1260. Thus, the court held that the similarities between the two works "pertain[ed] to non-copyrightable ideas or unprotected *scenes a faire*," and were not protected expression. *Id.* at 1263 (dismissing claim as a matter of law for failure to show substantial similarity).[11]

Dutcher's remaining plot arguments are a series of randomly cobbled together events, none of which rises to the level of substantial similarity necessary to support an infringement claim. The assertion that both movies involve stringers killed by gunfire, for instance, is hardly surprising in a film involving a dangerous profession. (It is also factually dissimilar—Luis is killed before *Falling* even begins and is not part of the movie; Rick is killed due to the actions of Lou at the climax of *Nightcrawler*.) The same is true of Dutcher's assertion that the "bad guys" die at the end of each film, a standard plot device true of scores of movies. *See Denker, 820 F. Supp. at 732* (using a "similar plot device … does not constitute infringement"). And the

---

[11] Other examples abound. *See, e.g.*, *Denker, 820 F. Supp. at 734* (rejecting argument that *Driving Miss Daisy* infringed on plaintiff's novel and holding that plot similarities were "unprotectible *scenes a faire* and cannot be the basis of an action for infringement"); *Beal, 20 F.3d at 460* (rejecting plaintiff's argument that his work was substantially similar to *Coming to America*); *Smith, 578 F. Supp. at 1300-03* (same with respect to *Stir Crazy*); *see also Nichols v. Universal Pictures Corp., 45 F.2d 119, 122 (2d Cir. 1930)* (same with respect to two works relating to Irish and Jewish family and the marriage of their children).

claim that in each film, the camera is turned on the videographer, is hardly original; the same thing happens in *The Public Eye* and in real life.[12]

Equally unavailing is Dutcher's attempt to equate what he calls the "apex scenes" of the films (but in reality are the climax of neither). In *Falling*, Eric stumbles across a murder scene entirely by accident and is anguished and morally conflicted as he films it, turning over the footage in its entirety. In *Nightcrawler*, Lou seeks out the home invasion scene intentionally and is perversely elated as he films it, editing the footage before selling it so that he can stage an even more elaborate and gruesome scene. The general fact that both characters film a murder scene and choose not to render assistance is unprotected *scenes a faire* and not substantial similarity. *See* Smith, 578 F. Supp. at 1302.[13]

Moreover, despite Dutcher's characterization of these mid-movie scenes as an "apex," the films' plots continue to diverge wildly thereafter, with Eric ending up dying after pleading for religious salvation, and Lou outsmarting the police, orchestrating more killings, and becoming even more successful in his business. Where the movies begin and end, and all of the narrative distance they travel in between, is simply nothing alike. Given these significantly

---

[12] *See, e.g.,* Stephanie Chavez, *Freelance Videographers Chase News for TV*, Los Angeles Times, August 3, 2003, available at http://articles.latimes.com/2003/aug/03/local/me-video3 (stringer becomes subject to media attention when he is arrested on suspicion of setting a 5,000-acre brush fire that destroyed four homes to obtain and sell the footage to television news stations); *The Public Eye* at 01:32:23 (other stringers photograph main character when he is arrested in connection with a public massacre).

[13] Indeed, cameramen often choose to film rather than rendering assistance in real life. *See, e.g.,* Andres Jauregui, *Officer: Witnesses Filmed Deadly Crash, Didn't Help Victims*, The Huffington Post, June 4, 2014, available at http://www.huffingtonpost.com/2014/06/04/crash-witnesses-filmed-victims_n_5444639.html (officer complaining that when he arrived on scene, surrounding bystanders had chosen to prioritize filming two people trapped and burning to death in a wrecked vehicle rather than trying to assist the victims).

different details, "[i]t can hardly be said that this constitutes a substantial similarity between the works." *Arden*, 908 F. Supp. at 1262.

**C.**    **Dialogue.**

Dutcher identifies three instances of dialogue in *Nightcrawler* that he claims are substantially similar to *Falling*, but none of the dialogue on which he relies is protected under copyright law.

First, Dutcher argues that characters in both films say "if it bleeds, it leads." [Dkt. No. 23 p. 133.]  This phrase is well-known in the journalism industry,[14] however, and it is well-established that "'[c]lichéd language, phrases, and expressions conveying an idea that is typically expressed in a limited number of stereotypic[al] fashions are not subject to copyright protection.'"  *Lumos, Inc. v. LifeStrength, LLC*, No. 2:12-CV-1196-TC, at *9 (D. Utah Sept. 3, 2014)* (citation omitted).  Because the phrase "if it bleeds, it leads" is "not original or creative," it is not protectable expression.  *Id.*

Second, Dutcher claims that *Nightcrawler* copies, verbatim, the on-air warnings that are given in *Falling*.  [Dkt. No. 23 p. 132.]  This is wrong as a factual matter.  In *Falling*, the newscaster recites the following warning:

> Warning: Channel 12 has exclusive footage of the attack.  These are graphic and violent images.  We alert the parents of young children and those who do not wish to view the exclusive footage to please turn away.  The footage will last

---

[14] Even a simple Google search for the phrase "if it bleeds it leads" reveals innumerable results, all referencing the common phrase. *See, e.g.,*  www.brainyquote.com (search of website for "if it bleeds it leads" accesses numerous quotes, including "[t]he old newspaper adage, 'If it bleeds, it leads,' is as true today as it was a century ago" and "[t]here are two sayings that are familiar in every news room across the country: (1) sex sells; (2) if it bleeds it leads"); http://tvtropes.org (search for "if it bleeds it leads" reveals similar references).

approximately 35 seconds.

[*Falling* Vol. 1, 37:44.]  By contrast, in *Nightcrawler*, two separate warnings are given:

> The vicious tragedy and senselessness of the brutal shooting as well as the victim's final moments, were all caught in graphic video, which we are about to show.  Viewer discretion is advised.
>
> ***
>
> Warning: KWLA has obtained exclusive footage from inside the crime scene in which at least three bodies can be observed.  Now we're going to show you segments of that footage throughout the rest of this broadcast, of course, but also throughout the day… Again, we are about to show you exclusive KWLA video from inside the actual crime scene and before broadcasting this video, we want to warn our viewers that these are extremely graphic images.

[Nightcrawler, 21:12; 1:13:44.]  This warning dialogue is not "identical," as Dutcher contends.

[Dkt. No. 23 p. 132.]  More important, the concept that a news station would provide its viewers with warnings before airing graphic footage is "standard treatment" that "necessarily result[s] from the choice of setting or situation," and therefore constitutes unprotected *scenes a faire.*

*Arden*, 908 F. Supp. at 1259 (internal citations and quotations omitted).

Third, Dutcher argues that both *Falling* and *Nightcrawler* have similar dialogue because in both films, another freelance photographer tells Eric and Lou that they are "five minutes" or "two minutes" late, respectively.  [Dkt. No. 23 p. 4.]  Since the stringer profession is, at its core, a race in which stringers compete to arrive first on the scene in the hope of obtaining sensational footage, the idea that a stringer might arrive late, or that competitors would taunt a stringer for arriving late, "necessarily follow[s] from [the] common theme" of what those professionals do and is unprotected *scenes a faire*.  *Arden*, 908 F. Supp. at 1259.[15]

---

[15] Dutcher also argues in passing that when Nina advises Lou to "think of our newscast as a screaming woman running down the street with her throat cut," her dialogue is "*essentially*" similar to the *Falling* scene in which the viewer sees a female reporter running; and that Lou's concocted story during his police interrogation explaining why he previously told the detectives

**D.**     **Pace.**

The pace of the two films also is nothing alike.  In *Falling*, the entire story occurs over a period of four days.  *Nightcrawler* occurs over a period of many months.  That is not substantially similar.  *See, e.g., Kouf*, 16 F.3d at 1045 (pace not substantially similar where the film *Honey I Shrunk the Kids* took place in a 24-hour period and plaintiff's film spanned a series of days); *Beal*, 20 F.3d at 463 (pace not substantially similar where *Coming to America* covered forty days and the plaintiff's novel took place over two years).

**E.**     **Setting.**

The setting of the two films is likewise neither protected nor substantially similar.  Dutcher cannot possibly claim he owns the exclusive right to all stories about stringers in Los Angeles.  Nor can he claim exclusive copyright protection of all similar "appearing" sections of Los Angeles, or famous landmarks like the Capitol Records building.[16]  *See Walker*, 784 F.2d at 49-50 (same 41st precinct of same South Bronx police station was not a protected setting); *Beal*, 20 F.3d at 463 ("the idea of a mosque-style palace with minarets is a *scene a faire* … about

---

he did not see the suspects' faces, is "*essentially*" the same as the most crucial story elements in *Falling*.  [Dkt. No. 23 p. 132 (emphasis added).]  Neither argument has merit.  First, neither comparison involves actual dialogue, only a strained comparison of character dialogue to events.  Second, the female reporter does not run down the street with her throat cut; and even if she had, no one was filming her.  Third, the concept of murderers tracking down a witness who has seen a murder in order to eliminate the witness before they can be identified is a well-worn and unprotected literary plot device that is used in practically every film in which a character is forced into the witness protection program.  Again, copyright law protects only a plaintiff's "particular expression of his ideas, not the ideas themselves."  *Arden*, 908 F. Supp. at 1259 (emphasis added) (citing 17 U.S.C. § 102(b)).

[16] Dr. Samuelsen's speculative assertion that both characters live in what "appears" to be the same section of Los Angeles and drive what "appear" to be the same Los Angeles streets lacks foundation.  [Dkt. No. 23 p. 129.]  This assertion is also particularly suspect given his admission that he is not personally familiar with the streets of Los Angeles.  [Dkt. No. 2 p. 17.]

Arabian or African royalty"); *see also* Robinson, 1995 WL 417076, at * 10 (rejecting argument that the setting of two works based on the shared concept of a 1950's era sitcom family interacting with a contemporary family were identical because both involved "a middle-class suburb;" "opening 'with a frontal shot of … a solid two story house with a well-maintained lawn shaded by stately trees" has been "commonly found in sitcoms for over 30 years" and is not a protectable element).

In fact, when it comes to setting, *Falling* and *Nightcrawler* are literally night and day different given that *Falling* occurs almost exclusively during the day while *Nightcrawler* is filmed almost exclusively at night. Regardless of the time of day, a Los Angeles setting, including its iconic locations, is clearly unprotected *scenes a faire*.

The only other argument Dutcher raises is that both films have "significant broken mirror scenes." [Dkt. No. 23 pp. 133-34.] Again, however, the presence of a broken mirror is not a unique or novel concept and likely has been used hundreds, if not thousands, of times in other films. But even if the concept of a broken mirror were protectable, the circumstances in which each broken mirror occurs is entirely different. In *Falling*, the mirror is in a public restroom and was already cracked when the reporter gazes into the mirror at her bloody face. In *Nightcrawler*, the mirror is in Lou's bathroom and shatters—not merely cracks—when Lou slams the vanity mirror shut in frustration and rage. Again, given these significant differences, the two mirror scenes are not substantially similar. *See, e.g., Arden*, 908 F. Supp. at 1262 (the fact that the two characters in *Groundhog Day* and *One Fine Day* both destroy their alarm clocks at some point "can hardly be said [to] constitute[] a substantial similarity between the works," particularly since "each scene is expressed through different details"); *Walker*, 784 F.2d

at 50 (fact that "a person is thrown off a room" in both works is insubstantial given that "the differences between the two incidents are overwhelming").

     **F.**    **Mood.**

     Some courts look to mood when comparing creative works, but at least one court in the Tenth Circuit has held that concepts like the feel or essence of a film are not protectable under copyright law because feel, essence, and reaction by the viewer are "not fixed, and can vary in accordance with many factors, none of which relate to the [p]laintiff's copyrighted work." *Madrid*, 209 F. Supp. 2d at 1241.  Therefore, those amorphous concepts do not meet the requirements of the Copyright Act, which protects works or authorship "*fixed in any tangible medium of expression*."  *Madrid*, 209 F. Supp. 2d 1241 (quoting 17 U.S.C. § 102(a)).

     Even if this Court were to compare the moods of the two films, there is no question that they are entirely different.  *Falling* is a religiously-based morality tale, Eric and Davey are empathetic characters, and the viewer mourns their deaths when the two are killed as a result of their poor choices.  *Nightcrawler* is a dark, psychological thriller wholly devoid of religion or any sense of moral redemption.  The viewer is deeply disturbed by Lou and left troubled and uneasy when Lou is rewarded by capitalistic society for his amoral choices, inhumanity, and complete disregard for others.

     **G.**    **Cinematography.**

     Dutcher also argues the cinematography of both films is substantially similar because in both *Falling* and *Nightcrawler*, Eric and Lou film through their car windshields and duck under yellow tape, and both films show footage reflecting hand-held shakiness and footage of the victim in the camera viewfinder.  [Dkt. No. 23 p. 135.]  Given that both films are about

professional stringers, none of these cinematic elements is surprising or unique.  Instead, they

are cinematic techniques "commonly linked to a particular genre" and unprotected *scenes a*

*faire*.  Arden, 908 F. Supp. at 1259.  Furthermore, even if such elements were original, all of the

accident and crime scene incidents in *Falling* are filmed using full frame viewfinder shots with

a red "REC" display in the corner, showing the viewer what Eric is seeing through his camera.

There are no such shots in *Nightcrawler*.

  **H.**  **Sequence of Events.**

   Dutcher argues most strenuously that *Falling* and *Nightcrawler* share a substantially

similar sequence of events because both Eric and Lou drive around Los Angeles listening to

police scanners obtaining graphic footage, are late to the scene of one reported accident,

covertly record both murderers and a murder victim, and sell their footage to a single source;

the murders either violently track down Eric or are violently tracked down by Lou; and the

murderers are killed as a direct or indirect result of the videographers.[17]  [Dkt. No. 23 p. 20.]

Dutcher attempts to equate this general sequence of events with the unique and particular

sequence of events in Wilson v. Walt Disney Co., No. 14-CV-01441-VC, 2014 WL 4477391

(N.D. Cal. July 29, 2014), which analyzed whether a trailer from the animated movie *Frozen*

---

[17] Dutcher contrives to separate this handful of general events into more numbered points so as
to make the similarities appear more significant.  Dutcher also identifies points that are not
common to both films.  For example, Dutcher argues that both Lou and Eric "do not call the
police despite having the ability to do so," [Dkt. No. 23 p. 19] but there is no suggestion in
either film that Lou or Eric was in a position to do so—in fact, in *Nightcrawler*, police were
already on their way to the scene, so there was no need for Lou to place a duplicative call.
Dutcher's contention that both Eric and Lou "watch the video recording in the presence of the
videographer's friends who are all horrified by what they are watching" is also factually false as
Lou has no friends.  And even if Nina could be considered a friend, when she watches his
murder footage she does so with excitement and admiration.

was substantially similar to the plaintiff's animated short movie *The Snowman*.  Dutcher's reliance on *Wilson* is misplaced.

Unlike the two films in this case, the animated works in *Wilson* were relatively short— less than five minutes and two minutes, respectively, as evidenced by the video clips Dutcher has included with his Motion for Preliminary Injunction.  [Dkt. 25, Exs. 20-21.]  If the Court reviews the two clips at issue in *Wilson*, it will be immediately apparent why they are substantially similar, including unique details involving an unusual story about a snowman. Those similarities are nothing like the scant common elements in *Falling* and *Nightcrawler*.[18]

Dutcher attempts to mimic this analysis by manufacturing a similar sequence of events, but he does so by picking scenes out of context and using common and unprotected elements that one would expect to see in a film about professional stringers, including listening to police scanners, recording accidents, arriving late on scene, obtaining sensational footage such as a murder in progress, selling that footage for a profit, and suffering ramifications from the murderers caught on tape.  Rather than constitute a protected sequence of events, Dutcher's list of similarities constitutes unprotected *scenes a faire.  See Beal*, 20 F.3d at 464 (similarity in sequence between *Coming to America* and *The Arab Heart* were insufficient to show infringement; "[a]ny work in which the protagonist is royalty visiting America will naturally move from a palace to an airport to some form of lodging" and "all works involving courtship

---

[18] The same is true of the Honda commercial at issue in *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Corp.*, 900 F. Supp. 1287 (C.D. Cal. 1995), which Dutcher also cites in his Motion for Preliminary Injunction.  One instantly is reminded of the James Bond movies that the commercial was found to have infringed. [*See* Dkt. No. 25, Ex. 19.]  Both the snowmen clips and the Honda commercial amply illustrate what it looks like when two works *actually* share substantial similarities.

and marriage will feature a wedding, usually near the end of the story.  Beyond common elements of the broadest nature, the works have no similarities of detail"); *Arden*, 908 F. Supp. at 1262 (similarities in sequence between *Groundhog Day* and *One Fine Day* were "incidental to the idea of a repeating day or the theme of romance, and as such are unprotected").

To illustrate the fallacy of Dutcher's sequence comparison, if this Court were to employ the same analysis, it could as easily find that *Star Wars* is substantially similar to *The Wizard of Oz* because in both films (i) the main character lives with an aunt and uncle in a rural environment, (ii) the main character journeys on a quest far from home, (iii) both characters employ a method of air transportation that propels the character through the sky at a tremendous speed, (iv) the main character meets and is accompanied by a character made of metal, (v) the character also meets and is accompanied by a character completely covered in hair, (vi) the main character must seek out a wise older man for help, (vii) the villain rules over a kingdom, (viii) the villain's subjects are terrified of the villain, (ix) the villain dresses completely in black, (x) the villain wears memorable and distinctive headgear, (xi) the quest requires the team of heroes to infiltrate the villain's stronghold, (xii) the main character eventually meets a wise old man who provides good advice, (xiii) the team of heroes work together to dispatch the villain in the climax, and (xiv) the main characters are decorated as heroes in a ceremony at the end.

Of course, *Star Wars* is not substantially similar to *The Wizard of Oz* any more than *Nightcrawler* is substantially similar to *Falling*.  Because copyright does "not protect thematic concepts or scenes which necessarily must follow from certain similar plot situations," *Smith, 578 F. Supp. at 1302*, Dutcher's attempt to establish a substantial similarity of sequence based on unprotected *scenes a faire* is defective as a matter of law.

I.        **Religion.**

The only other argument Dutcher advances in support of his substantial similarity

argument is a religious comparison so tenuous and unsupported as to border on the absurd.

Dutcher argues that *Nightcrawler* copies *Falling* by using religion as a central theme,

and in such a purportedly brazen manner that *Nightcrawler*'s "references to *Falling*'s portrayal

of Mormonism make Dan Gilroy look incredibly bold and arrogant." [Dkt. No. 23 pp. 12-13.]

Dutcher advances three arguments in support of this assertion, all of which fail.

First, Dutcher argues that *Nightcrawler* "expressly uses the Los Angeles Mormon

Temple as part of its opening setting." [*Id.* at 12.]  What Dutcher fails to tell the Court is that

the LDS Temple is only one of <u>eighteen</u> random images that are displayed during

*Nightcrawler*'s opening credits.  Also included are images of an empty billboard, the Griffith

Observatory, a stretch of winding road, an oil well, a deserted bus station, a Ferris wheel, a rest

stop, and a steam vent, among other things.  No image lasts longer than eight seconds, all are

shown at night (as opposed to the brilliantly lit LDS Temple scene in *Falling*), and the LDS

Temple is given no greater or lesser emphasis than any of the other random images

accompanying the credits.  There is nothing in this montage to suggest that the single seven-

second credits image of the LDS Temple was included in order to reflect religion as

*Nightcrawler*'s "central theme" or as an "overt Mormon reference[]."[19] [Dkt. No. 23 pp. 8, 12.]

Second, Dutcher argues that Lou "look[s] like a Mormon" because he dresses in a white

shirt.  [Dkt. No. 23 p. 8.]  In support of this argument, Dutcher points to an interview of Dan

---

[19] Incidentally, the LDS Temple also appears in the background of *Stringers: LA* reality series.
*See Stringers: LA (Episode 1)* at 21:22, available at https://www.youtube.com/watch?v=-pYDF8KwA2k.

Gilroy in which Mr. Gilroy states that he put Lou in a white shirt because "the white shirt …
represented the idea that he has now become a professional" and has "the added benefit of
looking like … a Mormon missionary." [*Id.* At 8.]  The problem with this argument is two-fold.
First, Dutcher's reliance on Mr. Gilroy's hearsay is erroneous because "copyright protects the
author's actual expression of an idea, and not the idea as it existed in the author's imagination."
*Zambito*, 613 F. Supp. at 1111.  But even if Mr. Gilroy intended Lou to look like a Mormon
missionary, the LDS religion does not have a monopoly on white shirts any more than Mr.
Dutcher has a monopoly on Mormon-looking characters.  A reasonable lay observer would not
necessarily associate Lou with a Mormon missionary merely because he wears a white shirt.
More likely, a reasonable viewer would believe that Lou wears a white shirt for the primary
reason Mr. Gilroy articulates: because Lou is an aspiring *professional* and "the white shirt for us
represented the idea that he has become a professional."  [Dkt. No. 23 p. 8.]  And in any event,
putting a sociopath in a white shirt hardly makes him substantially similar to a basically good
but lapsed missionary.

        Third, Dutcher argues that *Nightcrawler* copies *Falling*'s religious elements by
"substituting" capitalism for religion.  It goes without saying that religion and capitalism are
two entirely different things.  *See Nichols*, 45 F.2d at 121-22 (recognizing that two stories were
"quite different" where the father objected to his child's marriage in the first work because the
marriage would be outside of his faith where "[i]n the other, zealotry is wholly absent" and the
father objected to his child's marriage for economic reasons).  And even if capitalism were
Lou's religion like Mormonism is Eric's, it is not as if *Nightcrawler* portrays Lou as a lapsed
capitalist who suddenly rediscovers the benefits of the free market on his death bed.  Dutcher's

strained attempt to equate religion and capitalism does nothing to establish substantial similarity and should be rejected by this Court.

## V.     THIS CASE MERITS AN AWARD OF ATTORNEYS' FEES AND COSTS TO DEFENDANTS.

The Copyright Act allows for the discretionary award of attorneys' fees and costs to a defendant who successfully defends against an objectively unreasonable copyright infringement claim.  17 U.S.C. § 505; *see also, e.g.*, *Amadasum v. Dreamworks, LLC*, 359 F. Supp. 2d 1367, 1375 (N.D. Ga. 2005) (awarding fees where plaintiff "'failed to provide one scintilla of evidence'" that the defendant had access to plaintiff's copyrighted work (citations omitted)); *Allen v. Ghoulish Gallery*, No. 06CV371, 2008 WL 474394, at *7 (S.D. Cal. Feb. 19, 2008) (awarding fees to defendants where "none of the individual elements [in plaintiff's infringement claim] were entitled to copyright protection"); *Chivalry Film Prod. v. NBC Universal, Inc.*, No. 05 Civ. 5627, 2007 WL 4190793, at *3 (S.D.N.Y. Nov. 27, 2007) ("the denial of fees and costs to a prevailing defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to chill" (quotations omitted)).

Although the Court should not award fees and costs lightly, there are cases where the claim is so far-fetched and objectively unreasonable that an award is appropriate to further the purposes of the Act and deter the filing of unfounded and frivolous claims.  This is such a case. For all the reasons explained above, it is clear Dutcher had no factual or legal basis to allege that Mr. Gilroy had access to Dutcher's unreleased film or that *Nightcrawler* infringed it.  Yet he filed this lawsuit anyway.  The Court should hold Dutcher responsible for his conduct.  Because "a successful defense of a copyright infringement action may further the policies of the

Copyright Act every bit as much as a successful prosecution of an infringement claim," *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994), and because Dutcher's copyright claim is so lacking in merit and objectively unreasonable, the Court should award Defendants their attorneys' fees and costs.

## **CONCLUSION**

For all of the foregoing reasons, Dutcher has failed to plead facts sufficient to establish either component of copying—that Mr. Gilroy had access to *Falling*, or that the two works are substantially similar.  Because this Court can reach each of these issues as a matter of law, this Court should grant Defendants' Motion and dismiss Dutcher's claim.

RESPECTFULLY SUBMITTED this 26th day of May 2015.

PARR BROWN GEE & LOVELESS, P.C.

/s/ *Jeffrey J. Hunt*
Jeffrey J. Hunt
David C. Reymann
Cheylynn Hayman
Megan J. Houdeshel

Attorneys for Defendants Bold Films LP, Bold Films Productions, LLC, Open Road Films, LLC, and NBCUniversal Media, LLC

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 26th day of May 2015, I filed the foregoing

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** via the

CM/ECF system, which electronically served the following:

Joseph D. Young (josephdyoung7@gmail.com)
Joshua T. Covey (joshcovey@gmail.com)
COVEY & YOUNG, PLLC
2150 South 1300 East, Suite 500
Salt Lake City, UT  84106

Stephen Silverman (steve@stephensilverman.com)
STEPHEN SILVERMAN LAW
8901 E. Mountain View Rd., Ste. 211
Scottsdale, AZ  85258

/s/ *Jeffrey J. Hunt*